[Crim. No. 4042. Fifth Dist. Jan. 14, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
RICKEY LEE COLVIN, Defendant and Appellant.

618

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Ezra Hendon, Chief Assistant State Public Defender,

Michael Arkelian, Tom Lundy and Julia Cline Newcomb, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and Thomas D. McCrackin, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**LAURITZEN, J.***—On June 7, 1978, in the Kern County Superior Court, a jury found appellant guilty of two counts of violation of Penal Code section 288. The victim in one count was a five-year-old boy. The victim in the other count was the boy's four-year-old sister. The matter was referred to the probation officer for report and recommendation. Hearing on the report and arraignment for judgment was set for July 5, 1978. On that date, the court adjourned the criminal proceedings and certified appellant to the superior court for mentally disordered sex offender[1] proceedings pursuant to the mandatory provisions of Welfare and Institutions Code section 6302, subdivision (c).[2] The court, after handing appellant the written certification, appointed two doctors to examine him and report to the court as to whether or not he was an MDSO and, if so, whether he could or could not benefit from treatment. The court did not at that time orally inform appellant that he was certified to be an MDSO, or of his rights to reply or produce witnesses, as directed by section 6305, or of his right to cross-examine adverse witnesses. A further hearing was held on July 26, 1978, at which time the issue, by stipulation of counsel, was submitted upon the written reports of the doctors. The court found that appellant was an MDSO who could benefit from treatment in a state hospital and, as recommended by the mental health director, committed him to the Atascadero State Hospital for care and treatment, maximum time of commitment not to exceed five years. Thereafter, the commitment was amended specifying "a total fixed time of six years, four months." Appellant was never informed by the court of his right to a jury trial upon

---

*Assigned by the Chairperson of the Judicial Council.

[1]Mentally disordered sex offender is hereinafter abbreviated at times to MDSO.

[2]Hereinafter, statutory references are to the California Welfare and Institutions Code, unless otherwise noted.

demand made within 15 days after date of commitment.[3] Appellant filed a timely notice of appeal.

Appellant attacks the MDSO commitment only; therefore, the facts of the underlying crimes will not be discussed. We now address the explicit and implicit issues presented to us on this appeal.

I

## WAS APPELLANT PREJUDICED BY THE COURT'S FAILURE TO ADVISE HIM OF HIS RIGHT TO A JURY TRIAL?

Appellant initially contends that the superior court erred in failing to inform him of his right to demand a jury trial following the entry of a commitment order. (§ 6318.) Specifically, it is advanced that (a) equal protection and (b) due process concerns arise unless the court was so required to inform appellant. Respondent counters that appellant is not entitled to a jury trial in the absence of a timely request under the relevant statutory provision. Appellant's contentions have merit.

The pertinent provision is section 6318, which provides in part as follows: "If a person ordered under Section 6316 to be committed as a mentally disordered sex offender to the department for placement in a state hospital for care and treatment or to the county mental health director for placement in an appropriate facility, or any friend in his behalf, is dissatisfied with the order of the judge so committing him, he may, within 15 days after the making of such order, demand that the question of his being a mentally disordered sex offender be tried by a judge or by a jury in the superior court of the county in which he was committed."

We now address appellant's equal protection and due process arguments.

(A) *Equal protection contention.*

 Relying upon *People* v. *Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373] and its comparative analysis of protec-

---

[3]Section 6318 gives one committed as an MDSO the right to a de novo jury trial on the issues if the demand is made within 15 days of his MDSO commitment, but does not expressly require the court to inform him of this right.

tions provided to mentally disordered individuals under the Lanterman-Petris-Short Act,[4] appellant argues that the lower court's failure to advise him of his right to a jury trial under section 6318 offends the equal protection clauses of the California and federal Constitutions. (Cal. Const., art. I, § 7, subd. (a); U.S. Const., 14th Amend.) Before examining the merits of this contention, we briefly review the applicable legal principles underlying equal protection analysis.

■ The first prerequisite to a meritorious equal protection claim is a showing that the state has adopted a classification which affects two or more *similarly situated* groups in an unequal manner. (See *In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 312, 601 P.2d 549]; *People* v. *Lakey* (1980) 102 Cal.App.3d 962, 974 [162 Cal.Rptr. 653].) Once such a disparity is proven, the state must show that a rational distinction exists between those included in and those excluded from the class. (*In re Gary W.* (1971) 5 Cal.3d 296, 303 [96 Cal.Rptr. 1, 486 P.2d 1201].) ■ Closer scrutiny is given to a statute which affects a fundamental interest or involves a suspect class. In such instances, the state bears the burden of establishing both that it has a compelling interest in making such a distinction and that the distinction necessarily furthers that purpose. (*People* v. *Feagley, supra,* 14 Cal.3d 338, 356; *In re Gary W., supra,* 5 Cal.3d at p. 306.) ■ With these principles in mind, we now address the equal protection issue raised by appellant.

In *People* v. *Feagley, supra,* 14 Cal.3d 338, the court examined the question of whether the state could constitutionally deny to persons committed under the MDSO scheme the right to a unanimous jury verdict, which was granted to persons committed under the LPS Act. (*Id.,* at p. 352.) Initially, the court noted that an MDSO and an individual committed under the LPS Act are in similar positions. It stated, "We have likewise recognized in California that although it might not be true of all persons, 'Many individuals who satisfy the definition of "mentally disordered sex offender" would be subject to civil commitment to a mental institution under other provisions of the law,' citing, inter alia, the LPS Act. [Citation.]" (*Feagley, supra,* 14 Cal.3d at p. 353.) Next, the court acknowledged that the section 6318 jury trial was similar to the postcertification jury proceeding in the LPS Act: "Nor is it relevant that Feagley had already been adjudged a mentally disordered sex offender at the initial commitment hearing. [Citation.] At that stage of the proceedings Feagley had no statutory right to a

---

[4]See section 5000 et seq. This act shall hereafter be abbreviated LPS Act.

jury trial of any kind. (See §§ 6302-6316.) The trial here in issue was therefore his first and only opportunity to present to a jury the evidence supporting his assertion that he was not a mentally disordered sex offender .... The proceeding, in sum, was a full-scale trial de novo of the question whether Feagley was a mentally disordered sex offender. *It was therefore indistinguishable in its effect and importance from the trial provided by section 5303, in which an individual proceeded against under the LPS Act also seeks for the first time to persuade a jury that he is not a mentally disordered person.* Accordingly, there is no rational basis for granting the latter the right to a unanimous verdict while denying it to the former. " (*People* v. *Feagley, supra,* 14 Cal.3d at pp. 356-357, italics added, fn. omitted.) Finally, the court held that, under either rational basis or close scrutiny analysis, the denial of the unanimous jury to MDSOs contravened equal protection principles. (*Feagley, supra,* at p. 358.)

In contrast to section 6318, it should be noted that the LPS schema does contain a provision mandating the court to inform an alleged mentally disordered person of his right to demand a jury. Section 5302 provides in relevant part: "[¶] At the time of filing a petition for post-certification treatment *the court shall advise the person named in the petition* of his right to be represented by an attorney and *of his right to demand a jury trial.*" (Italics added.)

Using the comparative analysis of *Feagley,* it is clear that appellant's equal protection contention has merit. *Feagley* recognized that alleged MDSOs and mentally disordered individuals under the LPS Act were similarly situated as to status and as to the effect of the jury trial after initial commitment procedures.[5] The state has not demonstrated any rational distinction between the two classes; thus, the reasoning in *Feagley* requires a finding that appellant was denied equal protection under the California and federal Constitutions. Pursuant to section 6318, the superior court has an obligation to inform appellant of his right to demand a jury trial.

---

[5]In fact, our Supreme Court found that procedural safeguards should be more rigorous for MDSOs. After comparing commitment procedures in the MDSO and LPS schemes, the *Feagley* court concluded: "It follows that in comparison with the procedure under the LPS Act, it is easier to commit a man as a mentally disordered sex offender and harder for him to secure his release. One would therefore expect the procedural safeguards in the latter proceeding to be commensurately greater. Instead, they are substantially lesser, in that the Legislature denies the mentally disordered sex offender the right to a unanimous jury verdict which it grants to a person committed under the LPS Act." (*People* v. *Feagley, supra,* 14 Cal.3d at p. 358.)

Furthermore, our Supreme Court has held that the right to a jury trial in civil commitment proceedings is a fundamental right. (See *People v. Feagley, supra,* 14 Cal.3d at p. 356; *People* v. *Burnick* (1975) 14 Cal.3d 306, 317-318, 324 [121 Cal.Rptr. 488, 535 P.2d 352]; discussion, *infra,* issue I-B; cf. *In re Gary W., supra,* 5 Cal.3d at pp. 306-307.) Since no compelling interest, much less a rational basis for differentiation can be demonstrated by the state, there was a denial of equal protection in the instant case.

Accordingly, the commitment order must be annulled and the cause returned to the superior court with directions to inform appellant of his right to demand a jury trial within 15 days after the making of the commitment order.

(B) *Due Process Contention.*

In the alternative, appellant claims that due process requires that a court inform an alleged MDSO of his right to demand a jury trial. Respondent replies that the right to a jury trial under section 6318 is purely statutory and that the provision does not explicitly require notice to be given by the court. As with his equal protection argument, appellant correctly contends that due process requires such advisement by the superior court.

The California Supreme Court in *People* v. *Burnick, supra,* 14 Cal.3d 306 held that the reasonable doubt standard of proof applies in MDSO proceedings in order to comply with federal and state due process requirements. (*Id.,* at p. 310; accord *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 178-179 [167 Cal.Rptr. 854, 616 P.2d 836]; *People* v. *McCarthy* (1980) 110 Cal.App.3d 296, 301 [167 Cal.Rptr. 772].) In so doing, the court affirmatively relied upon language quoted in *Specht* v. *Patterson* (1967) 386 U.S. 605, 609-610 [18 L.Ed.2d 326, 330, 87 S.Ct. 1209], where the United States Supreme Court indicated (quoting *United States* v. *Maroney* (3d Cir. 1966) 355 F.2d 302, 312): "'A defendant in [a commitment] proceeding is entitled to *the full panoply of the relevant protections which due process guarantees in state criminal proceedings.* He must be afforded *all those safeguards which are fundamental rights and essential to a fair trial,* including the right to confront and cross-examine the witnesses against him.'" (*People* v. *Burnick, supra,* 14 Cal.3d at pp. 317-318.) Our Supreme Court also stated: "We recognize that the right to jury trial and the standard of

proof beyond a reasonable doubt are not mentioned among the rights thus enumerated .... however, *the omission of such matters from the Specht opinion is without significance.*" (*Burnick, supra,* at pp. 316-317, italics added.) This language must be implicitly viewed as support for the proposition that the right to a jury in MDSO proceedings is a fundamental *constitutional* right. Such an interpretation accords with reasoning in similar cases decided by our high court and the United States Supreme Court. (See *People v. Feagley, supra,* 14 Cal.3d at p. 356 (quoting *Gary W.*); *In re Gary W., supra,* 5 Cal.3d at pp. 306-307 ("The right to a jury trial in an action which may lead to the involuntary confinement of the defendant, even if such confinement is for the purpose of treatment, is no less fundamental."); see also *Vitek v. Jones* (1980) 445 U.S. 480, 495-496 [63 L.Ed.2d 552, 566, 100 S.Ct. 1254, 1264]; *Addington v. Texas* (1979) 441 U.S. 418, 425-427 [60 L.Ed.2d 323, 330-331, 99 S.Ct. 1804, 1809].)

Since *Feagley* found the omission of the right to a jury trial inconsequential in *Specht,* the guaranty in section 6318 must be read as being a *constitutional* protection. In order to protect the constitutional right to a jury trial, several key precedents have stated that an individual must be informed of his right before he can make an intelligent waiver. (See *Boykin v. Alabama* (1969) 395 U.S. 238, 243, fn. 5 [23 L.Ed.2d 274, 280, 89 S.Ct. 1709]; *Bunnell v. Superior Court* (1975) 13 Cal.3d 592, 604-605 [119 Cal.Rptr. 302, 531 P.2d 1086].) This advisement would be equally applicable to the jury trial which is sanctioned under section 6318. Without advisement from the superior court, alleged MDSOs (like appellant) are denied their due process protections as far as the right to a jury trial is concerned.

Respondent argues that the right to a jury trial following an initial commitment is merely statutory, relying upon language in *People v. Ruiz* (1969) 1 Cal.App.3d 992, 999-1000 [82 Cal.Rptr. 408]. *Ruiz* stated that, "It is true that, if a constitutional right exists, it must be observed unless waived and that a waiver implies, among other things, a knowledge that the right existed. It is also true that, where a statute expressly directs that a defendant be given notice of rights—either constitutional or statutory—a failure to give such notice is fatal. [Citation.] *But there is neither a constitutional nor a statutory command that a defendant be advised of his rights under section 5512.5 [now section 6318].* Absent such a command, none need be given." (*Id.,* at p. 1000.) Although the opinion does state that the right to a jury trial is

merely statutory, *Ruiz* appeared almost six years before *Burnick*.[6] Since *Burnick* suggests that such a right is of constitutional significance, further reliance on *Ruiz* is now outmoded. Instead, the recognition that the right is constitutional means that an individual must have "a knowledge that the right existed." (*People* v. *Ruiz, supra,* 1 Cal.App.3d at p. 1000.) This further means that an alleged MDSO must be informed of this right so that he can either request a jury trial within 15 days after the commitment order or waive this right by not making the proper demand.

A cardinal rule of statutory construction provides that courts construe legislative enactments so as to uphold their constitutionality wherever possible. (See 13 Cal.Jur.3d, Constitutional Law, § 71, p. 133.) A legislative enactment susceptible of two constructions—one consistent and the other inconsistent with the provisions of the Constitution—should be so construed as to harmonize with the Constitution. (See *Braxton* v. *Municipal Court* (1973) 10 Cal.3d 138, 145 [109 Cal.Rptr. 897, 514 P.2d 697]; 13 Cal.Jur.3d, Constitutional Law, § 71, pp. 133-134.) With these principles in mind, we construe section 6318 to require that the trial court inform an alleged MDSO of his right to demand a jury trial following any initial commitment decision and, as so construed, we hold that section 6318 is constitutional.

■■ ■■■ Having recognized that equal protection and due process require advisement of the right to demand a jury trial, the question then becomes whether such requirement should be given retroactive effect.[7]

The relevant legal principles were summarized in the case of *People* v. *Kaanehe* (1977) 19 Cal.3d 1, 10 [136 Cal.Rptr. 409, 559 P.2d 1028]: ■ "Whether a judicial decision establishing new constitutional standards is to be given retroactive effect is customarily determined by

[6]To the extent that *People* v. *Hymes* (1958) 161 Cal.App.2d 668, 673 [327 P.2d 219], cert. den. (1960) 362 U.S. 980 [4 L.Ed.2d 1015, 80 S.Ct. 1067], suggests that the court has no obligation to advise an alleged MDSO of his right to demand a jury trial, it has been supplanted by *Burnick*'s constitutional analysis.

[7]Since this court is stating a new rule of law, it is incumbent upon us to determine whether the decision should be applied retroactively. (See *People* v. *Whittington* (1977) 74 Cal.App.3d 806, 823 [141 Cal.Rptr. 742]; *People* v. *Sanford* (1976) 63 Cal.App.3d 952, 957 [134 Cal.Rptr. 555], cert. den. (1977) 431 U.S. 969 [53 L.Ed.2d 1066, 97 S.Ct. 2930].)

weighing the following factors: '(a) the purpose to be served by the new standards, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of retroactive application of the new standards.' (*Stovall* v. *Denno* (1967) 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967]; accord, *In re Johnson* (1970) 3 Cal.3d 404, 410 [90 Cal.Rptr. 569, 475 P.2d 841].) 'It is also clear that the factors of reliance and burden on the administration of justice are of significant relevance only when the question of retroactivity is a close one after the purpose of the new rule is considered.' (*In re Johnson, supra*, 3 Cal.3d 404, 410.) Decisions have generally been made fully retroactive only where the right vindicated is one which is essential to the integrity of the fact-finding process. On the other hand, retroactivity is not customarily required when the interest to be vindicated is one which is merely collateral to a fair determination of guilt or innocence. (*In re Johnson, supra*, 3 Cal.3d 404, 410-413 and cases cited therein.)" (Accord *Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 257-258 [158 Cal.Rptr. 330, 599 P.2d 636]; *People* v. *Superior Court* (*Harris*) (1979) 100 Cal.App.3d 386, 390-391, fn. 2 [160 Cal.Rptr. 880]; *People* v. *Cooper* (1979) 94 Cal. App.3d 672, 680 [156 Cal.Rptr. 646].) ▮ We now apply this analysis to the instant case.

The reason for the new rule is to more adequately safeguard an individual's right to a jury trial on his MDSO status. As such, it has no bearing on guilt nor the reliability of the factfinding process. The People aptly note that the rule does not affect a fair determination of guilt or innocence, since (1) an independent jury had previously found appellant guilty at the criminal stage of the proceedings and (2) the rule does not impinge on the actual MDSO factfinding process. Instead, the rule assures application of procedural safeguards and aids appellate courts in determining whether an individual made an intelligent and knowing waiver under section 6318. (See discussion of retroactivity issue in *People* v. *Hall* (1980) 28 Cal.3d 143, 157, fn. 9 [167 Cal.Rptr. 844, 616 P.2d 826]; *In re Yurko* (1974) 10 Cal.3d 857, 865-866 [112 Cal.Rptr. 513, 519 P.2d 561]; *In re Tahl* (1969) 1 Cal.3d 122, 133-135 [81 Cal.Rptr. 577, 460 P.2d 449], cert. den. (1970) 398 U.S. 911 [26 L.Ed.2d 72, 90 S.Ct. 1708].)

The second two criteria even more clearly dictate that our new rule should not be given retroactive effect. Prior to this case, *Ruiz* was the only reported decision which addressed appellant's contention. Although

*Burnick* and *Feagley* subsequently suggested that the right to a jury was more than statutory in nature, no court had an opportunity to re-evaluate *Ruiz*. Accordingly, it was reasonable for trial courts to conclude that no oral advisements to alleged MDSOs were necessary. (Cf. *In re Joe R.* (1980) 27 Cal.3d 496, 512 [165 Cal.Rptr. 837, 612 P.2d 927].)

Furthermore, retroactive application of our new rule would have a serious adverse effect on the administration of justice. It goes without saying that many individuals have been committed as MDSOs in the past without the benefit of a jury trial. To conclude now that all these individuals must be informed of their right to a jury trial would nullify a large number of commitment orders. Since this is not a desirable policy result, we limit the application of our decision to appellant and to section 6318 hearings conducted after this opinion becomes final. (See *In re Perrone C.* (1979) 26 Cal.3d 49, 58 [160 Cal.Rptr. 704, 603 P.2d 1300]; *In re Love* (1974) 11 Cal.3d 179, 188-189 [113 Cal.Rptr. 89, 520 P.2d 713]; *People v. Superior Court (Harris)*, *supra*, 100 Cal. App.3d 386, 389-390.)

## II

### Was Appellant Given Adequate Notification by the Court of the Allegation that He Was an MDSO And of His Right to Make a Reply and to Produce Witnesses Pursuant to Section 6305?

Appellant next contends that he was not adequately notified by the court of the allegation that he was an MDSO and of his right to make a reply and to produce witnesses. (§ 6305.) Respondent disagrees, arguing that notice was provided by *written* language in the certification form and by the court's oral advisement at the MDSO proceeding. Further, respondent suggests that a waiver of these rights can be inferred from the fact that appellant purportedly stipulated to submit the matter upon the reports of the two court-appointed doctors. A careful examination of the record shows that appellant was not adequately informed of the checklist of rights specified in section 6305.

Section 6305 in pertinent part provides: "The person certified or alleged to be a mentally disordered sex offender shall be *taken before* a judge of the superior court of the county. The judge shall *then inform him* that he is certified or alleged to be a mentally disordered sex offender, *and inform him of his rights to make a reply and to produce*

*witnesses in relation thereto.*" (Italics added.) With regard to this statutory provision, the record shows that the following actions were undertaken by the superior court. On July 6, 1978, a certification form was filed by the certifying court, in which appellant was told: "THE COURT HEREBY appoints a Board of Alienists, consisting of Richard E. Burdick and F. A. Matychowiak to determine whether or not the defendant is a mentally disordered sex offender and whether or not he will benefit from care and treatment in a state hospital.

"The Court fixes the time and place of the hearing on the Reports of the physicians thus appointed, as July 26, 1978, at 8:30 o'clock A.M. in Department 7 of this Court, before me.

"THE CLERK IS DIRECTED to report these proceedings to the Probation Department of the County of Kern with instructions to said department to prepare a Report to be submitted to the Court and to the examining Physicians, pursuant to the provisions of the Welfare and Institutions Code.

"The defendant is informed of his right to reply to the Report of the Physicians and to produce witnesses on his own behalf should he so desire." At the actual MDSO proceedings held on July 26, 1978, the superior court (which happened to be the same judge as the certifying court) advised appellant of his right to cross-examine the two court-appointed doctors. Following this advisement, the court noted that appellant's counsel "has indicated that you wish to waive your right to cross-examine the doctors." To this, appellant replied, "Yes, it is."[8] Accordingly, the matter was submitted on the reports of the two doctors, and the court adjudged appellant to be an MDSO.

---

[8]Appellant argues in his reply brief that (1) he did not expressly consent to submission of the case on the medical reports, and that (2) a stipulation to submit the issue on the reports was tantamount to a guilty plea, or admission of being an MDSO, thereby invoking the procedural protections outlined in *Bunnell* v. *Superior Court, supra,* 13 Cal. 3d 592, 605. We agree. Although the record indicates appellant's waiver of the right to cross-examine the doctors, it does *not* indicate that appellant expressly consented to submit the matter on the doctors' reports alone, that he consented to an uncontested hearing, or that he waived any of his section 6305 rights. A waiver under section 6308 necessarily implies a waiver of section 6305 rights, as well as other constitutional and statutory rights. We are of the.opinion that an alleged MDSO who consents to submission of his case on the doctors' reports, pursuant to section 6308, cannot be committed unless the record clearly shows that he has individually, personally and expressly *waived each relevant constitutional and statutory right.* The record should reflect such waivers regardless of whether the individual expressly or impliedly assented to an uncontested hearing on the doctors' reports.

The People initially respond to appellant's claim of defective notification by pointing to the *written* information contained in the certification form about the section 6305 rights. Although written notification is demonstrated by respondent, this *type* of notification does not satisfy the intendment of section 6305. That provision states that the certified individual "shall be taken *before* a judge of the superior court .... The judge shall *then* inform him that he is certified or alleged to be a mentally disordered sex offender, and inform him of his rights to make a reply and to produce witnesses in relation thereto. *The judge shall by order fix such time and place for the hearing and examination in open court as will give reasonable opportunity for the filing of the probation officer's report as provided in Section 6306, and for the production and examination of witnesses.*" (Italics added.) The use of the words "before a judge" and "then inform," by their plain meaning, suggests that the court is to *orally* notify an alleged MDSO of his section 6305 rights at a pre-MDSO hearing. This interpretation is bolstered by the fact that the court then proceeds to issue an order specifying the time and place of the MDSO hearing itself after the notification procedure.[9]

The present record shows that oral notification of section 6305 rights was not given by the trial court to appellant. Instead, the certification form (entitled "Order Adjourning Proceedings and Appointing Medical Examiners") acted as notice of certification, as a section 6305 notification, and as a notice of the upcoming MDSO proceeding. Further, the written advisement on section 6305 rights was printed in small type on page 2 of the form. This course of action exhibits the inherent dangers

---

[9]Further support is found in section 6304, which suggests proper language to be embodied in a certification form. The recommended form reads as follows in one part: "The above-named defendant shall be taken *before* said court, as provided in Section 6305 of said code, on the ... day of ..., 19 ..., *at the hour of* ...." (Italics added.) This language strongly supports the view that section 6305 contemplates personal appearance of an alleged MDSO before the superior court judge, who then *orally* informs him of his rights.

We also note that oral notification of the right to counsel is necessary where a defendant appears for criminal arraignment without counsel. Specifically, Penal Code section 987, subdivision (a), states that, "[the defendant] shall be *informed* by the court that it is his right to have counsel before being arraigned, *and shall be asked* if he desires the assistance of counsel." (Italics added.) (Accord *In re Birch* (1973) 10 Cal.3d 314, 319 [110 Cal.Rptr. 212, 515 P.2d 12].) Since the criminal arraignment procedure and section 6305 are both concerned with informing an individual of important rights, the language in Penal Code section 987, subdivision (a), lends support to the position that oral notification is required under the analogous provision in the Welfare and Institutions Code.

in accepting the adequacy of written notification. Instead of being taken *before* a superior court which *orally* recites the section 6305 rights, an alleged MDSO must have the foresight to read the small print on a form which acts as a multipurpose notification. Reliance on written notification fails to advance the purpose of section 6305—notifying the individual of his rights while he is before a judge. Only *oral* notification on the record constitutes the type of advisement intended by section 6305.

In addition to the certification form, the People allege that appellant obtained "ample notification" from the court when it advised him of his right to cross-examination at the MDSO proceeding, a right which was expressly waived by appellant. This argument fails for two reasons. First, section 6305 contemplates *oral* notification prior to the actual proceeding; the court's advisement here occurred at a stage which was too close to the MDSO proceedings. Otherwise, an individual would not be given sufficient notification for purposes of preparing a competent cross-examination of the testifying psychiatrist. Second, although the record reveals a personal waiver of cross-examination by appellant *under section 6308* (see *People v. Townsend* (1971) 20 Cal.App.3d 919, 926 [98 Cal.Rptr. 8]; *People v. Washington* (1969) 269 Cal.App.2d 246, 250 [74 Cal.Rptr. 823]), there is no indication that he was either advised of or waived his rights to make a reply and to produce *his own* witnesses. Furthermore, as noted in footnote 8 of this opinion, the record fails to show that appellant agreed to submit the matter on the doctors' reports pursuant to section 6308.

Nonetheless, in contending that written notification was sufficient, the People place heavy reliance upon *People v. Coronado* (1980) 104 Cal.App.3d 491 [163 Cal.Rptr. 746]. In that case, a municipal court judge failed to state his reasons for MDSO certification to the superior court pursuant to the statutory requirement of section 6302, subdivision (d). The majority opinion stated that Coronado had "adequate notice" of details from the probation report utilized by the municipal court. Further, the majority noted that Coronado could show no prejudice, since he "was fully aware of the basis for the hearing and raised no objection." (*Coronado, supra,* 104 Cal.App.3d at p. 496.)[10] *Coronado* is distinguishable from the present situation in two respects. First, there is

---

[10]In his dissent, Justice Wiener summarily noted: "... the certification fails to meet the requirements of the statute itself for it does not contain the reasoning for the court's findings there was probable cause for believing defendant an MDSO. [Citations.]" (*Coronado, supra,* 104 Cal.App.3d at p. 499 (dis. opn. of Wiener, J.).)

no indication that appellant was "fully aware" of his section 6305 rights from the small-print material on the certification form. Second, we note that one of the *constitutional* rights mentioned in the *Boykin-Tahl* enumeration (*Boykin* v. *Alabama, supra*, 395 U.S. 238, 243 [23 L.Ed.2d 274, 279-280]; *In re Tahl, supra*, 1 Cal.3d 122, 130) is "the right to confront one's accusers"; since this is akin to the section 6305 rights, we deem it necessary to require an oral notification. *Coronado* did not involve a critical right in need of such scrupulous protection.

It is clearly established that failure to advise the alleged MDSO of his section 6305 rights renders the commitment void. (See *People* v. *Succop* (1967) 67 Cal.2d 785, 789, 790 [63 Cal.Rptr. 569, 433 P.2d 473], cert. den. (1968) 390 U.S. 983 [19 L.Ed.2d 1281, 88 S.Ct. 1104]; *People* v. *Yarber* (1979) 90 Cal.App.3d 895, 906 [153 Cal.Rptr. 875]; *In re Acosta* (1971) 21 Cal.App.3d 51, 54 [98 Cal.Rptr. 208]; *In re Baker* (1970) 5 Cal.App.3d 55, 57 [84 Cal.Rptr. 814]; *People* v. *Hunter* (1969) 270 Cal.App.2d 683, 685 [76 Cal.Rptr. 101]; *People* v. *McDonald* (1968) 257 Cal.App.2d 846, 848 [65 Cal.Rptr. 530]; *People* v. *Berry* (1968) 257 Cal.App.2d 731, 737 [65 Cal.Rptr. 125]; *In re Kramer, supra*, 257 Cal.App.2d 287, 289, 290-291; *People* v. *Harvath* (1967) 251 Cal.App.2d 780, 781-782, 783 [60 Cal.Rptr. 15] (2d app. (1969) 1 Cal.App.3d 521 [82 Cal.Rptr. 48]).) This is so because commitment depends on strict compliance with the specific statutory prerequisites for maintenance of the proceeding. (*In re Kramer, supra*, 257 Cal.App.2d at p. 289; cf. *In re Raner* (1963) 59 Cal.2d 635, 639 [30 Cal.Rptr. 814].) The superior court should personally inform appellant of his section 6305 rights at an oral proceeding on remand.

## III

### DID APPELLANT PERSONALLY WAIVE HIS RIGHTS TO REPLY AND PRODUCE WITNESSES?

■ We now turn to whether the record adequately reflects that appellant waived his rights to reply and produce witnesses.

In *People* v. *Hunter, supra*, 270 Cal.App.2d 683, the court discussed the importance of former section 5503 (now § 6305) in the MDSO

scheme. The court stated: "Section 5503 requires the court to give a defendant information of his rights to reply and to produce witnesses. The Legislature thus recognized the importance of a defendant understanding his rights to resist mentally disordered sex offender classification by removing any possibility of conjecture or surmise in the matter. We cannot assume Hunter knew his rights. There can be no waiver without knowledge of the rights waived. (*In re Johnson*, 62 Cal.2d 325, 334 [42 Cal.Rptr. 228, 398 P.2d 420].)

"*In addition, Hunter did not express a consent to any waiver. For the same reasons of importance the Legislature requires a judicial advisement of rights, we hold any waiver of a defendant's rights to reply and produce witnesses must be made personally by the defendant, under circumstances reasonably indicating he knows the rights he is waiving.* (See *In re Jones*, 61 Cal.2d 325, 329-330 [38 Cal.Rptr. 509, 392 P.2d 269].)" (*People* v. *Hunter, supra*, 270 Cal.App.2d at p. 685, italics added.) Further, although section 6305 rights can be waived by express consent of the alleged MDSO, no waiver can be implied from mere silence. (*People* v. *Berry, supra*, 257 Cal.App.2d at p. 737; *In re Kramer, supra*, 257 Cal.App.2d at p. 290.)

Here, the record is devoid of any indication that appellant waived his section 6305 rights. Like *Hunter*, there was no record of a waiver in the present case. Accordingly, on remand, the superior court should also obtain a personal waiver of section 6305 rights by appellant in the event that he desires to make such relinquishment.

IV

DOES SECTION 6316.1 CONSTITUTE A DENIAL OF EQUAL PROTECTION BECAUSE IT AUTOMATICALLY COMMITS MDSOS FOR A PERIOD OF TREATMENT EQUAL TO THE UPPER TERM FOR THE UNDERLYING CRIMINAL OFFENSE AND PRECLUDES GOOD-TIME CREDITS?

Appellant contends that section 6316.1, which requires that his maximum term of commitment be set by reference to the upper imprisonment term applicable to the underlying offense and which denies good-time credits against the maximum term, offends equal protection principles. These issues have been resolved against him in *People* v. *Saffell* (1979) 25 Cal.3d 223, 232-233, 235 [157 Cal.Rptr. 897, 599 P.2d 92]; thus, it is unnecessary to engage in further discussion.

V

DOES SECTION 6316.1 VIOLATE THE PROTECTION AGAINST CRUEL AND UNUSUAL PUNISHMENT?

█ Appellant then suggests that section 6316.1 constitutes cruel and unusual punishment because it requires calculation of the maximum term to include all possible aggregate terms (i.e., upper-base term, enhancements, and consecutive sentences) without reference to the particular nature of the offense and/or offender. (See *In re Foss* (1974) 10 Cal.3d 910, 919-920 [112 Cal.Rptr. 649, 519 P.2d 1073], criticized on another point in *People v. White* (1976) 16 Cal.3d 791, 796-797, fn. 3 [129 Cal.Rptr. 769, 549 P.2d 537]); *In re Lynch* (1972) 8 Cal.3d 410, 425-429 [105 Cal.Rptr. 217, 503 P.2d 921].) This contention fails when it is recognized that MDSO commitment contemplates treatment rather than punishment.

Recently, in *People v. Saffell, supra,* 25 Cal.3d at page 229, our Supreme Court acknowledged that: "... the entire statutory scheme providing for the diversion of MDSOs from the mainstream of the criminal justice system clearly indicates that 'in MDSO cases, subsequent confinement of the ... person is for purposes of *treatment,* not punishment.' [Citations.]

"The Act contemplates that the only MDSOs who may be confined for the 'maximum term of confinement' are those who the court finds 'could *benefit by treatment* in a state hospital, or other mental health facility....' (§ 6316, italics added.) The individual who is determined to be an MDSO but who is *not* amenable to treatment is to be returned to the criminal court for disposition of the charges against him. This is another strong indication that commitment as an MDSO is primarily for treatment." That the treatment rationale rescued the MDSO scheme from the cruel and unusual proscription was made clear in the following language: "Not only is medical treatment the *raison d'etre* of the mentally disordered sex offender law, it is its sole constitutional justification. It is settled that 'A person committed as a mentally disordered sex offender is not confined for the criminal offense but because of his *status* as a mentally disordered sex offender.' (Italics added.) [Citation.] ... [Par.] *But involuntary confinement for the 'status' of having a mental or physical illness or disorder constitutes a violation of the cruel and unusual punishment clauses of both the state and fed-*

*eral Constitutions [citations] unless it is accompanied by adequate treatment."* (*People v. Feagley, supra,* 14 Cal.3d at p. 359, italics added.)

In the instant situation, appellant has made no claim of receiving inadequate treatment at Atascadero. Since MDSO confinement is for treatment in lieu of criminal punishment, section 6316.1 is not violative of the cruel and unusual punishment proscription. Thus, it is unnecessary to apply the *Lynch-Foss* test. (Cf. *People v. Poggi* (1980) 107 Cal.App.3d 581, 591-592 [165 Cal.Rptr. 758] (§ 6316.2, subd. (j), does not violate constitutional guaranty against cruel and unusual punishment).)

## VI

DOES SECTION 6316.1 CONTRAVENE THE DOCTRINE OF SEPARATION OF THE POWERS CONTAINED IN ARTICLE III, SECTION 3 OF THE CALIFORNIA CONSTITUTION?

 Equally devoid of merit is appellant's claim that section 6316.1 contravenes the doctrine of separation of powers (Cal. Const., art. III, § 3) because it proscribes judicial discretion to consider mitigating factors by mandating automatic imposition of the upper term. As noted in *Saffell*, the court can only confine an individual for "the maximum term of confinement" who *"could benefit by treatment"* in a state hospital or other mental health facility. (*People v. Saffell, supra,* 25 Cal.3d at p. 229.) Furthermore, two recent appellate courts have held that there must be a finding of amenability to treatment in order to extend commitment pursuant to section 6316.2. (*People v. Lakey, supra,* 102 Cal.App.3d 962, 972; *People v. Compelleebee* (1979) 99 Cal.App.3d 296, 302 [160 Cal.Rptr. 233]; but see *People v. Poggi, supra,* 107 Cal. App.3d at p. 588 (disagrees with *Compelleebee* and *Lakey*; no finding of amenability required).) These aspects of the MDSO statutory scheme reveal the court can indeed consider "mitigating factors" in arriving at a determination that an individual "could benefit by treatment." Since the amenability finding is vested with the presiding court, the Legislature has not precluded judicial discretion in MDSO proceedings.

To the extent that appellant questions the authority to specify confinement for the maximum term, such a determination is properly

reserved to the legislative branch. Since the Legislature has exclusive power to define crimes and fix penalties (see *People* v. *Tanner* (1979) 24 Cal.3d 514, 519, fn. 3 [156 Cal.Rptr. 450, 596 P.2d 328]; *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]), it was appropriate for that branch to specify the term of confinement *following* the judicial determination of amenability to treatment. This accords with *Saffell*'s observation "... that the state does have a compelling interest in identifying and providing medical attention to those individuals amenable to treatment who commit sexually motivated criminal acts." (*People* v. *Saffell, supra,* 25 Cal.3d at p. 230.) Thus, the legislative imposition of confinement for the maximum term does not offend the separation-of-power doctrine of our state Constitution.

## VII

### DOES SECTION 6300 VIOLATE DUE PROCESS OF THE LAW BECAUSE (A) IT IS VAGUE, OR (B) IT RESULTS IN ARBITRARY COMMITMENTS?

 Appellant contends that section 6300[11] violates due process of the law. His arguments lack merit.

First, he argues that the provision is vague in not adequately defining the class of sex offenders which are "dangerous to the health and safety of others." This vagueness contention was answered in *People* v. *Kirk* (1975) 49 Cal.App.3d 765, 769 [122 Cal.Rptr. 653], where the court stated that the language "is one commonly understood by people of reasonable intelligence." Moreover, *Kirk* noted, "The concept of what is dangerous must be determined on a case-by-case basis. Applying the standards of *People* v. *Burnick* and *People* v. *Feagley*, juries will now have to be convinced, unanimously and beyond a reasonable doubt, that one such as appellant does pose a danger to the health and safety of others. This safeguard sufficiently protects one accused of being a mentally disordered sex offender." (*People* v. *Kirk, supra,* 49 Cal.App.3d at p. 771.) Since *Kirk* has been used by sister appellate courts in sustaining companion provisions from vagueness claims (see *People* v. *Henderson* (1980) 107 Cal.App.3d 475, 491-492 [166 Cal.Rptr. 20] (§ 6316.2); *People* v. *Lakey, supra,* 102 Cal.App.3d at p. 976 (§ 6316.2), there is no reason to depart from its cogent reasoning.

---

[11]Section 6300 provides in pertinent part: "As used in this article, 'mentally disordered sex offender' means any person who by reason of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others."

It should also be noted that *Kirk* was affirmatively cited in the recent case of *People* v. *Martin* (1980) 107 Cal.App.3d 714, 723-725 [165 Cal.Rptr. 773]. As in *Lakey* and *Henderson,* the *Martin* court found that section 6316.2 was not so vague as to violate due process rights. Since section 6316.2 contains many of the same terms employed in section 6300, *Martin* is persuasive authority for denying appellant's vagueness contention.

Second, appellant argues that section 6300 results in arbitrary commitments because there is no reliable psychiatric method for predicting dangerousness and there is a risk of over-prediction by psychiatrists. Notwithstanding appellant's impressive compendium of psychiatric studies, his second argument fails for two reasons. Initially, although our Supreme Court has acknowledged "these limitations on the present-day practice of psychiatry" (*People* v. *Burnick, supra,* 14 Cal.3d 306, 327), it has decided to not join ". . . in the conclusion of certain well-known writers that in civil commitment proceedings no psychiatrists should be permitted to give their opinions as to future dangerousness and that any commitment based on such an opinion constitutes a deprivation of liberty without due process of law." (*Id.,* at pp. 327-328, fn. omitted.) Instead, the *Burnick* court expressed a belief that a reasonable doubt standard on the issues of dangerousness and MDSO status would help guard against arbitrary commitments based on tentative or overpredictive psychiatric opinions. (See *id.,* at pp. 328, 330-332; see also *People* v. *Martin, supra,* 107 Cal.App.3d 714, 725.)[12] Besides this, it is salient to observe that recent empirical data belies the criticisms asserted by appellant. This is revealed by the following discussion from a recent commentary: ". . . Although psychiatrists are not infallible, it appears that they are capable of ascertaining the desired class [of MDSOs] with a reasonable degree of certainty.

"The inquiry into a defendant's sexual sociopathy cannot be limited to a determination of a specific psychotic disorder, since a sociopath may exhibit any one of a wide spectrum of disorders. The statutes, therefore, are necessarily broad so as to include those individuals who pose a constant threat to society and are unable to learn from experience or benefit from prison.

---

[12]Besides making the reasonable doubt standard applicable to MDSO jury proceedings, *Burnick* extended this standard of proof to "any stage of the proceedings in which the person is committed or recommitted to the State Department of Health pursuant to a finding that he is a mentally disordered sex offender (e.g., §§ 6316, 6326, 6327)." (*People* v. *Burnick, supra,* 14 Cal.3d at p. 332.)

"...................

"The Kozol study [involving psychiatric research conducted at a Massachusetts hospital] illustrates an instance where psychiatrists isolated a potentially dangerous group wherein four times as many persons acted dangerously as the number of people in the group which were found to be non-dangerous. Treatment of those persons reduced their violent acts by 82% in comparison to the group that was considered dangerous yet not committed.

"These results are substantiated by studies conducted at other institutions treating sexual sociopaths. A follow-up study at Maryland's Patuxent Institute evaluated 577 defendants examined by psychiatrists. At the time of the study, an average of eight years had elapsed since the defendants' release. Of the 156 released against psychiatric recommendation at the initial hearing, 81% committed subsequent crimes contrasted with only 7% of the 135 released upon recommendation after successful treatment. The study further revealed a direct correlation between the amount of treatment and the recidivist rate.

"These results substantiate the credibility and expertise of the practicing psychiatrist. By utilizing proper testing techniques the psychiatrists have been able to identify a disturbed group of individuals who display dangerous tendencies. Not only were these psychiatrists able to isolate the individual with reasonable certainty, but proper treatment programs have had a positive effect in alleviating those tendencies." (Comment, *Evolution of a Procedural Hybrid: The Sexual Sociopath Statutes and Judicial Response* (1976) 13 Cal. Western L.Rev. 90, 98, 100.) After a survey of the recent psychiatric studies on the subject, the commentary concluded, "Although not all sexual sociopaths would necessarily act violently, they are disturbed individuals who pose a distinct threat of harm. By effectively identifying such individuals, the statutes are neither vague nor overbroad, ..." (*Id.*, at p. 100.) This contemporary evaluation of psychiatric literature convincingly showed that appellant exaggerates the risk of overprediction. Accordingly, for the two foregoing reasons, it cannot be said that section 6300 results in arbitrary commitments offensive to due process principles.

## VIII

DOES A COURT HAVE TO STATE REASONS FOR ITS CHOICE OF A PLACEMENT ALTERNATIVE BECAUSE SUCH A DECISION IS LIKE A "SENTENCE CHOICE" REQUIRING A STATEMENT OF REASONS BY THE COURT?

By analogy to California Rules of Court, rule 405(f), appellant contends that the court has an obligation to state reasons for its decision to place him in a state hospital rather than alternate mental facilities. This contention must be rejected.

Penal Code section 1170, subdivision (a)(1), reads in relevant part: "The Legislature finds and declares that the purposes of imprisonment for crime is punishment." Penal Code section 1170, subdivision (c), provides that, "The court shall state the reasons for its sentence choice on the record at the time of sentencing." In order to implement these penal provisions, the California Rules of Court were adopted by the Judicial Council. Rule 403 of the California Rules of Court clearly specifies that "these rules apply only to criminal cases in superior court in which the defendant is convicted of one or more offenses punishable as a felony by a determinate sentence imposed pursuant to chapter 4.5 (commencing with § 1170) of Title 7 of Part 2 of the Penal Code." As the advisory committee comment to this rule makes clear, "The operative portions of [Penal Code] section 1170 deal exclusively with prison sentences; and the mandate to the Judicial Council in section 1170.3 is limited to criteria affecting the length of prison sentences and the grant or denial of probation." (23 West's Ann. Court Rules (1979) Supp. Pamp. p. 38.) Finally, rule 405(f) defines "sentence choice" as "the selection of any disposition of the case which does not amount to a dismissal, acquittal, or grant of a new trial."

As the foregoing provisions demonstrate, the mandate of stating reasons for sentence choice on the record is applicable to criminal sentencing alternatives rather than MDSO treatment procedures. It has already been noted that MDSO proceedings are treatment-oriented, distinguishing them from the penal nature of criminal proceedings. Accordingly, there is no requirement under section 6316[13] that the court state its reasons for commitment to a state hospital on the record.

---

[13]Section 6316 states in relevant part: "If, after examination and hearing, the court finds that the person is a mentally disordered sex offender and that the person could benefit by treatment in a state hospital, or other mental health facility the court in its discretion has the alternative to return the person to the criminal court for further disposition, or may make an order committing the person to the department for placement in a state hospital, or may commit the person to the county mental health director for placement in an appropriate public or private mental health facility, approved by such director, and a copy of such commitment shall be personally served upon said person within five days after the making of such order."

Nonetheless, appellant suggests that prudent policy considerations dictate a statement of reasons by the committing court. Unless this is done, argues appellant, no meaningful appellate review of this decision is possible. We reject this argument.

In *People* v. *Stanley* (1980) 103 Cal.App.3d 599, 603 [163 Cal.Rptr. 270], we stated: "We agree with the view and unanimous holding in *People* v. *Yarber* (1979) 90 Cal.App.3d 895, 906 [153 Cal.Rptr. 875], that the 'Legislature intended that *before* a court decided to commit a defendant to a mental health facility, it would have the recommendation of the county mental health director as to whether the commitment should be to a state hospital or to some other mental health facility.' (Fn. omitted.)" This passage from *Stanley* recognizes that section 6316 merely requires the trial court to have a recommendation from a particular county official upon which to base its placement decision. Since the county mental health director recommended that appellant be committed to Atascadero in this case, it was proper for the court to defer to this opinion. Appellant's policy suggestion of stating reasons on the record would frequently result in an idle act—the superior court would merely repeat the reasons listed in the health director's recommendation. Furthermore, it is doubtful that intelligent appellate review would be impeded by a failure to state reasons on the record, since augmentation procedures can bring the recommendation before this court for examination. Once this recommendation is before an appellate court, it can review the question of whether the superior court abused its discretion by committing an individual to a particular mental facility.

A similar policy issue was faced by the court in *People* v. *Yarber, supra*, 90 Cal.App.3d 895. There, it was contended that *court-appointed psychiatrists* should be directed by the court to concern themselves with amenability to treatment other than in a state hospital. The court disposed of this contention as follows: "[¶] Although *the better practice* may be for the court to direct the appointed experts to state an opinion as to whether an offender could benefit from treatment in a facility other than a state hospital, *it does not necessarily follow that the offender has a procedural right that the court do so.*" (*Id.*, at p. 904, italics added.) As in *Yarber*, it may be preferable that the court state reasons on the record which justify its decision to place an individual in a specific mental facility. However, there is no requirement binding the court to do so. Since the court here did order the required recommendation from the Kern County Director of Mental Health, there was proper compliance with section 6316.

## IX

DID THE COURT ADEQUATELY STATE REASONS FOR COMMITTING AP-
PELLANT TO ATASCADERO STATE HOSPITAL IN LIEU OF PLACING HIM IN A
LOCAL TREATMENT FACILITY?

Notwithstanding the conclusion that no statement of reasons was re-
quired, an examination of the record reveals that the court adequately
articulated reasons for committing appellant to Atascadero. The recom-
mendation from the county mental health director stated that appellant
was not suitable for outpatient services provided through the Kern
County Mental Health Department. It suggested that "state hospital
services be provided to [appellant]." The superior court started to hand
the recommendation to appellant's counsel for perusal, but counsel indi-
cated that he had read the report and had no further comment. The
court subsequently ordered that appellant be committed to the state
hospital. Such a course of action by the court—reading portions of the
recommendation into the record and allowing review of the recommen-
dation by appellant's counsel—constituted a sufficient statement of
reasons for confining appellant to Atascadero.

The order committing appellant to Atascadero State Hospital for a
period not to exceed six years, four months is annulled. The appellant is
ordered returned to the superior court for a hearing to determine his
status as a mentally disordered sex offender in accordance with the pro-
cedural safeguards outlined herein (i.e., that the superior court (1)
inform appellant of his right to demand a jury following an initial com-
mitment order, (2) orally notify appellant that he is alleged to be an
MDSO and that he has the right to reply and to produce witnesses, (3)
obtain a personal waiver on the record in the event appellant wishes to
relinquish his section 6305 rights or his jury trial right, and (4) obtain
an express stipulation from appellant to submit the matter on the psy-
chiatric reports after advising him of the probable consequences of a
section 6308 submission).

Franson, Acting P. J., and Hanson (P. D.), J., concurred.

A petition for a rehearing was denied February 10, 1981, and the
opinion was modified to read as printed above.